# The Owners' Advocate
## (TOA, LLC)
7984 Coley Davis Road
Nashville, TN  37221
## 1-866-644-7776
Fax 1-866-998-9796

SENT VIA EMAIL TO: Brenda.george@wyndhamvo.com

October 2, 2009

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Members: Benji and Melissa Crooms, Contract # 00064-0721288

This letter is to notify you that Benji and Melissa Crooms have retained our services to assist them in the termination of their agreement to purchase with Wyndham Vacation Resorts. We are authorized to notify you, through Power of Attorney, that Benji and Melissa Crooms no longer intend to make further payments to Wyndham Vacation Resorts as they allege the terms of Contract # 00064-0721288 were fraudulently represented at the time of sale.

Also, be advised that Benji and Melissa Crooms no longer authorize Wyndham Vacation Resorts to make automatic withdrawals from their personal debit/credit card or bank account (if previously authorized to do so), and the cessation of any and all such withdrawals shall be effective immediately.

Our organization, The Owners' Advocate, (TOA, LLC), is a consumer rights protection group providing assistance and resources to consumers battling fraud and misrepresentation within the timeshare industry. We assist timeshare owners by monitoring, investigating, and exposing timeshare companies that fail to comply with the laws governing the rights of consumers. We do not provide legal advice and we do not represent ourselves as legal experts.

Benji and Melissa Crooms allege their right to cancel their contract with Wyndham Vacation Resorts due to various misrepresentations and fraud employed by the company's representative(s) during the sales presentation. The infractions alleged by our clients would therefore, under Florida Law, render the contract voidable. Some of the allegations of misrepresentation and fraud include the following:

- Falsely promising that the original meeting would last 90 minutes;
- Intentionally misleading our clients to believe they were attending something other than a timeshare presentation;
- Intentionally misleading our clients to believe that they needed a certain level of membership to have reservation power;
- Intentionally misleading our clients to believe that they would own their timeshare property after the loan was paid;
- Intentionally misleading our clients to believe that their timeshare would always be worth more than what they paid;
- Intentionally misleading our clients to believe that if they did not purchase that day the offer would expire;

1



EXHIBIT
COLLECTIVE
"A"

- Intentionally misleading our clients to believe that they could vacation wherever they wanted if they purchased an upgrade; and,
- Intentionally subjecting our clients to a high amount of pressure.

Facts:

In July 2007 Benji and Melissa Crooms attended what was promised to be a 90-minute Fairfield timeshare presentation, though the meeting ultimately lasted eight (8) hours, however. They met with sales agent Randall Otto Bayer, who convinced our clients that the Bonnett Creek Resort in Florida was an excellent investment as it would be Wyndham's flagship. Mr. Bayer claimed that the timeshare would be worth much more than what they paid. Based on this false information our clients purchased 156,000 points and were given an additional 154,000 bonus points to receive VIP status. They were told that VIP status would allow them several incentives, though to date they have not received any.

When our clients vacationed at Bonnett Creek in April 2007 they were asked to schedule an owner's update meeting in order to receive information about the Wyndham merger and ask questions. They were promised food vouchers and discounts on park tickets for attending the 90-minute meeting. As our clients had questions they agreed to attend, but ultimately the information meeting turned into yet another eight (8) hour sales presentation.

They met with sales agent Erina Brinkman, who claimed that their 156,000 points would not even allow them a full week at many Wyndham properties, and would not allow them to vacation with their three (3) children. Ms. Brinkman claimed that our clients needed to upgrade to at least 308,000 points, level one (1) VIP membership, which would allow them to go anywhere they wished and grant them higher reservation power. She reiterated that Bonnett Creek was a great investment, as it was Wyndham's flagship resort and the only timeshare location where they would own the actual property. Ms. Brinkman stated that once our clients paid off the loan they would own the property, and as it was near Disney it would always be worth more than what they had paid. Our clients paid $30,000.00 for the unit and cannot gain even $5,000 for it now, however.

Ms. Brinkman warned that if they did not purchase that day then the offer would expire, adding further pressure by stating that Bonnett Creek units were selling so quickly that none would be available in less than a month. When our clients complained that they did not know how to use the timeshare, Ms. Brinkman assured them that someone would always be available to answer their questions. After the purchase of the upgrade our clients again mentioned that they needed assistance as to how to best use their timeshare, and again they were promised that someone would be in contact with them to teach them how best to use it.

Our clients soon discovered that much of the information they received at the presentations was false. They are unable to reserve their timeshare at the locations of their choice, contrary to the promises made at the presentation. Our clients have paid timeshare marketing companies to sell their timeshare, but have unfortunately received no success in one and half (1½) years. Our clients never received the help they requested to best use their timeshare and as a result have lost points. They were also informed that they could no longer rent all of their points, so they are unable to recoup their investment or their lost points. Wyndham has continuously contacted our clients to invite them to more owner update meetings, though they recognize, as with the last meeting, that this is merely a ploy to persuade our clients to purchase more points.

It is the opinion of Benji and Melissa Crooms that consumer protection laws have been violated at the time of sale. These laws, which are readily available and accessible to anyone through the Internet and other resources, are public information. Some of these laws are listed below:

Florida Statutes

CHAPTER 721 VACATION AND TIMESHARE PLANS 721.11

***

4) No advertising or oral statement made by any seller shall:

(a) Misrepresent a fact or create a false or misleading impression regarding the timeshare plan or promotion thereof.

(b) Make a prediction of specific or immediate increases in the price or value of timeshare interests.

(c) Contain a statement concerning future price increases by a seller which are nonspecific or not bona fide.

***

(h) Misrepresent the nature or extent of any incidental benefit.

***

(k) Misrepresent the availability of a resale or rental program or resale or rental opportunity.

Breach of contract, or default, is commonly defined as the failure of one party (Wyndham Vacation Resorts) to live up to its contractual obligations without a legally valid reason for doing so. In this case, it is believed that consumer protection laws were violated through deceptive and misleading practices at the time of sale. Benji and Melissa Crooms allege that their ownership agreement in Contract # 00064-0721288 was misrepresented by representatives of Wyndham Vacation Resorts, and these actions would render the contract voidable. Fraud is defined as occurring when: "...*One party knowingly makes a material misrepresentation which is reasonably relied upon by another party to their detriment.*"

In light of the material misrepresentations and the breach of the Implied Covenant of Good Faith and Fair Dealing made by representatives at Wyndham Vacation Resorts, our clients are exercising their rights under laws, enacted in every state prohibiting unfair and deceptive trade practices in consumer transactions, to terminate this contract.

Benji and Melissa Crooms are also opting to dispute any and all charges made by Wyndham Vacation Resorts pursuant to the FAIR CREDIT BILLING ACT (FCBA), 15 U.S.C. §§ 1601, et seq. Statute 161 "Billing Errors" of the FCBA allows for dispute of unauthorized charges and/or charges for goods and services unaccepted or undelivered as agreed.

Per the terms of Contract # 00064-0721288, this notification has been sent in writing and delivered via certified mail, return receipt requested, to the addresses indicated in the

3

contract:

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Benji and Melissa Crooms have also expressed a strong desire to report the behavior of Wyndham Vacation Resorts representatives to the following agencies: Federal Trade Commission, the Florida Department of Real Estate, and Florida Attorney General Bill McCollum.

If you would like to resolve this matter with Benji and Melissa Crooms, you may contact our Resolutions Department at 866-644-7776, ext. 588. You may also contact us at the address listed above. Please refer all future correspondence directly to this office.

Thank you in advance for your attention to this matter.

Regards,


The Owners' Advocate, (TOA, LLC)

Copy:              Benji and Melissa Crooms
Attachments:       LPOA; Client Testimony; Client Contract

4

# The Owners' Advocate
## (TOA, LLC)
7984 Coley Davis Road
Nashville, TN  37221
## 1-866-644-7776
## Fax 1-866-998-9796

SENT VIA EMAIL TO:  brenda.george@wyndhamvo.com

October 5, 2009

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Members: Joel and Angela Kuchcik  Contract # 00064-0926416


This letter is to notify you that Joel and Angela Kuchcik have retained our services to assist them in the termination of their agreement to purchase with Wyndham Vacation Resorts. We are authorized to notify you, through Power of Attorney, that Joel and Angela Kuchcik no longer intend to make further payments to Wyndham Vacation Resorts as they allege the terms of Contract #00064-0926416 were fraudulently represented at the time of sale.

Also, be advised that Joel and Angela Kuchcik no longer authorize Wyndham Vacation Resorts to make automatic withdrawals from their personal debit/credit card or bank account (if previously authorized to do so), and the cessation of any and all such withdrawals shall be effective immediately.

Our organization, The Owners' Advocate, (TOA, LLC), is a consumer rights protection group providing assistance and resources to consumers battling fraud and misrepresentation within the timeshare industry.  We assist timeshare owners by monitoring, investigating, and exposing timeshare companies that fail to comply with the laws governing the rights of consumers.  We do not provide legal advice and we do not represent ourselves as legal experts.

Joel and Angela Kuchcik allege their right to cancel their contract with Wyndham Vacation Resorts due to various misrepresentations and fraud employed by the company's representative(s) during the sales presentation.  The infractions alleged by our clients would therefore, under Florida State Law, render the contract voidable.  Some of the allegations of misrepresentation and fraud include the following:

- Falsely claiming that the timeshare presentation would be limited to ninety minutes;
- Falsely misrepresenting a timeshare presentation as an opinion or an update meeting;
- Falsely claiming that the timeshare was an investment which would appreciate like real estate;
- Falsely claiming that the timeshare interest could be written off on a tax report;
- Falsely claiming that the construction of a new water park would increase the value of the timeshare;
- Falsely exaggerating the ease with which vacations could be booked;

1

- Falsely claiming that the timeshare points purchase would be more than enough to be able to book reservations anywhere, anytime;
- Falsely claiming that the maintenance fees would never increase;
- Falsely claiming that the maintenance fees would never increase by much
- Falsely claiming that maintenance fees could be offset by owner referrals;
- Falsely claiming that maintenance fees could be offset by a rental program;
- Falsely promising to act as a personal account manager;
- Falsely claiming that maintenance fees could be offset through the use of a MasterCard;
- Falsely claiming that the timeshare interest loan could be refinanced for a lower rate at a local bank;
- Falsely promising that an RCI coupon was good for any time;
- Falsely promising that all future timeshare units booked with Wyndham would be equivalent in quality to those shown during the tour;
- Falsely claiming to be on vacation as to avoid providing customer service after falsely promising to be a personal account representative for the customer;
- Falsely claiming that more points had to be purchased in order to be able to make reservations;
- Using unauthorized materials to detail the advantages of a timeshare purchase;
- Falsely claiming that the customer could make a living through the rental of their timeshares;
- Falsely claiming that the timeshare could be sold for a profit;
- Misrepresent the size and quality of the timeshare;
- Falsely claiming that the timeshare could be rented for a profit; and
- Falsely claiming that if the customer didn't purchase immediately, the offer would expire.

Facts:

   In August 2007, Joel and Angela Kuchcik took their kids to the Wisconsin Dells and stayed at the Wilderness Resort for a long weekend to close out the summer. When they checked in, they were approached by a sales representative who offered them free tickets to all of the local attractions, $40 in tokens for the hotel arcade, and a free dinner for that night in exchange for sitting in on a Wyndham presentation that would last only ninety minutes. He promised that it was not a sales meeting, and that they simply wanted opinions on the resort. The meeting was scheduled and the next morning Joel and Angela met with Brian Washington, a sales representative from Wyndham.
   Brian told Joel and Angela that the timeshare was an investment, which would appreciate like real estate, and that they could write off the interest from the purchase on their taxes. Brian stated that there were plans for a new water park right on the property and once it was built that the property would increase the value of the timeshare exponentially. Brian claimed that Joel and Angela could comfortably vacation on 210,000 points, every other year. Joel and Angela were told that it was enough to go wherever they would like to go at whatever time they wanted to travel. Brian repeatedly stated that the timeshare was an investment that their children could take over when they were gone. The pressure to purchase was centered around the two children, who were sitting next to Joel and Angela, listening to the presentation. Brian claimed that the maintenance fees would never go up and that it would be locked at its current rate for the entirety of Joel and Angela's lives. When Joel and Angela, after the purchase, found out that this was false, they called Wyndham, and a Wyndham representative told them although the sales representative had been incorrect, there was nothing they could do for the Kuchciks.
   During the presentation, Joel and Angela told Brian and Brian's manager that they did not have the money to finance the timeshare loan. Brian stated that they could use a home equity loan to finance it. The gentleman that took care of Joel and Angela's closing

2

stated the same thing.  They encouraged this action, and told Joel and Angela that they should refinance with their personal bank to get a lower interest rate.  The presentation was still going, after four hours.  Brian told Joel and Angela that the offer was only good for that moment, and that they didn't have time to think about it and get back to him later that day.  Joel and Angela said they still weren't sure, and that they didn't have any money on them.  Brian took them over to a woman who talked to them about the RCI Elite Credit Card.  They quickly opened up an account for Joel and Angela and charged the down payment onto the credit card for $1,595.  Brian placed Joel and Angela with a finance representative to finalize the sale.

After the finalization, Joel and Angela were told that they needed to wait until the new year hit, which was four months away, thus postponing them from making any reservations for future trips.  Once the member ID came in the mail, Joel and Angela started calling Wyndham to try and make reservations for their next vacation.  They were repeatedly turned down because of a lack of availability for April 2008.

During the presentation, Brian had given Joel and Angela a coupon to use with RCI, which he said would garner them a free vacation.  He claimed the coupon could be used at any time, but when Joel and Angela tried to redeem it, RCI told them that it was only good for certain times of the year and that timeshare companies often claimed otherwise to their customers.  Joel and Angela were never able to use that vacation.

In April of 2008, Joel and Angela settled for the only resort with any availability, which was Fairfield Glades in Tennessee.  Their condo was not up to the standard they expected, smelling musty and looking worn down.  They were shocked, because Brian had taken them through three model condos and had claimed that they would be able to relax in all of their future vacations, and kept commenting on how beautiful the condos would be.  He led Joel and Angela to believe that each one of their future trips would be spent in condos like the model condos he was showing to them.

When Joel and Angela checked in they were told that they had to sign up for an owner's meeting so that they could be updated on all the new, exciting things going on with Wyndham and some changes in Wyndham policies.  They asked if it was a sales meeting, and were told that it was not.  They were also told that they needed to attend the meeting in order to get their local coupons and "bag" of essentials. However, when Joel and Angela sat down with Scott Padgett, they found out that it was indeed a timeshare presentation.  Joel and Angela complained about the misrepresentations that they had been subject to in Wisconsin and Scott claimed that they had been "taken" by Brian, who had sold them a deed that was not useable.  Scott claimed that in order to make a reservation anywhere decent they would need to sell their deed back to Wyndham and buy a deed that would give them points every year and not every other year.   He called this "DSP" (deed specific priority).  Scott also told Joel and Angela that this was the reason that they had gotten such a rundown condo.  He said that they needed more points in order to be able to stay in the nicer, remodeled condos.  He even took the two of them through his models and assured that if they upgraded their deed to Bonnet Creek they would get nothing less than what he was showing them.

Scott claimed that Wyndham was willing to do a one-time offer with Joel and Angela, offering them the ability to buy a new contract with Bonnet Creek, Florida.  Joel and Angela were told that Bonnet Creek was better than the Dells for the Bonnet Creek property.  Mr. Padgett and his boss, Mike, claimed that it would be easy to sell it in the future.  Joel and Angela were told that since it was on Disney property, it would sell anytime.  Scott claimed that the offer was only good for as long as they were in his office, and that since the building they would be placed in was new construction, they would obtain the best deal by purchasing at that time.

Scott claimed that if they made the deal, that he would be assigned to them as a personal account manager, because they would have enough points to warrant such luxury.  However, after the sale, Joel and Angela found that Scott was never available.  Once, Scott's "wife" contacted Joel and Angela to tell them that he was out of town at a Wyndham conference for the next three weeks.  Joel and Angela didn't believe this call, and so called

3

the main desk at the resort, and asked to sp____ someone other than Scott, since he wasn't there for three weeks. The receptionist ____nfused, since Scott was in fact in the office, and had been all week. Joel and Ang___ ____lated this issue to a manager, who forced Scott to call and apologize. Scott also ____ ____that he would send them an RCI free trip coupon, which never came. When Jo___ ____Angela asked for a new personal representative, they were told by Wyndham ____ ____t title didn't exist and then stopped returning Joel and Angela's calls.

Joel and Angela were told that maintenance ____s would go up but only a little bit and that they wouldn't increase very often. Scott told Joel and Angela that they could eliminate their maintenance fees with owner referrals ____y signing up for the Trip Rewards MasterCard. Scott told Joel and Angela that for ____ry dollar they spent on it, those dollars would be converted into maintenance doll___, ____ich would eliminate the monthly maintenance fee easily. Joel and Angela signed ____ ___r the card, but soon found out that maintenance fees could not be eliminated by ____erting rewards points like Scott had claimed. Scott also showed Joel and Angela ho____ ____could offset or pay their maintenance fees by taking their points and renting them out. ____ndham would rent the points for them for 35% of the amount the unit rented for. Scott ____led to mention the fact that resorts that make the highest rent or are the easiest to ren____ ____given to the owners of these locations first. He also neglected to tell Joel and Angela ____ only 5% of each resort is allowed to be rented through Club Wyndham Access. He eve____ ____ructed Joel and Angela to use eBay so that Wyndham would not catch on to what they ____ ____doing and stop them from selling their points.

Scott claimed that Joel and Angela could ____ ____ir points to purchase airfare, cruises, car rentals, and amenities like Disney Park pass____ ____le claimed that the more they bought the better off they would be. After agreeing to p____ ____se the new 259,000 points every year at Bonnet Creek, Florida, Scott shook Joel an____ ____ela's hands and promised them that everything that he had told them was true and ____ ____they were finally in good hands. The presentation had lasted eight hours, forcing J____ ____d Angela to lose a full day of their vacation.

Joel and Angela repeatedly tried to boo____ ____cation at a resort, and finally got into Star Island in November of 2008. When they ____ ____d into their condo, it was again old, outdated, and looked nothing like the models th____ ____tt had showed them. Angry, Joel and Angela told the receptionist they didn't wan____ ____sit through another sales pitch and demanded to speak with someone regarding q____ ____ns they had about the problems they continued to have with their Wyndham timesha____ ____ey were placed in the sales room and introduced to the general manager. Joel and An____ ____asked many questions, and none were answered. The manager handed them off to ____ ____he called a Customer Service Survey member. This person also had no answers, b____ ____begin a timeshare sales presentation. Joel and Angela were angered, and walked out.

Joel and Angela visited Bonnet Creek in Flor___ in June 2009. Again, they met with a salesman, but said they didn't want to sit throu___ ___ the ninety minute presentation. They were determined to get their questions answer____ ____a live person, and were assigned to a representative named James Oh. They explain___ ____ir problems, and James told them that the reason they were still having trouble with ____ ____reservations was due to the fact that they needed to own 300,000 points and be____ ____IP member in order to get priority reservations. He used a diagram that was in th____ ____pe of a pyramid that showed Joel and Angela that they were in the bottom of the pyr____ ____and that all of the people who owned more points were getting reservations in the nic____ ____orts during peak periods.

James told Joel and Angela that their d____ ____was to a good resort but that it didn't mean much because they needed to buy more ____ts in order to ever get a reservation. Joel and Angela told James that they were not in ____ position to purchase more points and that the last two salesmen had already lied to th____ ____on the same topic. They were leaving when James claimed that he had suddenly g____en some foreclosures because of the economy that he would be able to sell. James ____imed that Wyndham was pretty much giving them away. He claimed that even frien____ ____d family could use the timeshare, and

4

that Joel and Angela could charge them for staying there. He asked them to get closer to the table and told them how they could rent the timeshare for a profit. James showed them a picture of a couple on his shelf, and said that they owned a couple million points and rented them out, turning the rental of their timeshares into a business. James said that the couple has so many points that they actually have people who work for them now. James insisted that Joel and Angela could earn a living using a rental program and that by renting their points, they could afford the new deed. They were also told they could use their points to purchase airfare, cruises, car rentals, and amenities like Disney park passes. James told them their current timeshare was useless and that if they didn't take advantage of the opportunity that day, the offer would expire.

James told Joel and Angela that if they put the down payment on a credit card that they could pay that off quickly by renting out the points. Joel and Angela bought what James claimed was a foreclosure deed, which gave them 224,000 points every even year. Again, the deed didn't kick in until January 2010. Joel and Angela are making payments on it for the next six months and are not able to use it at all. James assured Joel and Angela that even though it was every other year like the one in Wisconsin, that this one was better because it put them at the VIP mark, which is where they needed to be to get anywhere with the reservation folks. They spent over five hours of their vacation time going through James's sales pitch, while their children were forced to spend time in the children's area, which was inaccessible from the sales office. James claimed that now that they were VIP, he would be their personal advocate and that they could call him anytime to book a trip or ask questions about the plan. Since this last purchase, Joel and Angela have tried to contact the sales team at Bonnet Creek but have never received a call back.

It is the opinion of Joel and Angela Kuchcik that consumer protection laws have been violated at the time of sale. These laws, which are readily available and accessible to anyone through the Internet and other resources, are public information. Some of these laws are listed below:

*CHAPTER 721 VACATION AND TIMESHARE PLANS 721.11*

*4) No advertising or oral statement made by any seller shall:*

> *(a) Misrepresent a fact or create a false or misleading impression regarding the timeshare plan or promotion thereof.*

> *(b) Make a prediction of specific or immediate increases in the price or value of timeshare interests.*

> *(c) Contain a statement concerning future price increases by a seller which are nonspecific or not bona fide.*

> *(d) Contain any asterisk or other reference symbol as a means of contradicting or substantially changing any previously made statement or as a means of obscuring a material fact.*

> *(e) Describe any facility that is not required to be built or that is uncompleted unless the improvement is conspicuously labeled as "NEED NOT BE BUILT," "PROPOSED," or "UNDER CONSTRUCTION." If the facility is labeled "NEED NOT BE BUILT" or "PROPOSED," the seller may indicate the estimated date that such facility will be made part of the timeshare plan. If facility is labeled "UNDER CONSTRUCTION," the estimated date of completion must be included.*

> *(f) Misrepresent the size, nature, extent, qualities, or characteristics of the offered accommodations or facilities.*

5

*(g)  Misrepresent the amount or period of time during which the accommodations or facilities will be available to any purchaser.*

*(h)  Misrepresent the nature or extent of any incidental benefit.*

*(i)  Make any misleading or deceptive representation with respect to the contents of the public offering statement and the contract or the rights, privileges, benefits, or obligations of the purchaser under the contract or this chapter.*

*(j)  Misrepresent the conditions under which a purchaser may exchange the right to use accommodations or facilities in one location for the right to use accommodations or facilities in another location.*

*(k)  Misrepresent the availability of a resale or rental program or resale or rental opportunity.*

*(l)  Contain an offer or inducement to purchase which purports to be limited as to quantity or restricted as to time unless the numerical quantity or time limit applicable to the offer or inducement is clearly stated.*

*(m)  Imply that a facility is available for the exclusive use of purchasers if the facility will actually be shared by others or by the general public.*

721.01 "Florida Vacation Plan and Timesharing Act."

*721.20 Licensing requirements; suspension or revocation of license; exceptions to applicability; collection of advance fees for listings unlawful.--*

*(3)  A solicitor who has violated the provisions of chapter 468, chapter 718, chapter 719, this chapter, or the rules of the division governing timesharing shall be subject to the provisions of s. 721.26. Any developer or other person who supervises, directs, or engages the services of a solicitor shall be liable for any violation of the provisions of chapter 468, chapter 718, chapter 719, this chapter, or the rules of the division governing timesharing committed by such solicitor.*

*721.21  Purchasers' remedies.--An action for damages or for injunctive or declaratory relief for a violation of this chapter may be brought by any purchaser or owners' association against the developer, a seller, an escrow agent, or the managing entity. The prevailing party in any such action or in any action in which the purchaser claims a right of voidability based upon either a closing before the expiration of the cancellation period or an amendment which materially alters or modifies the offering in a manner adverse to the purchaser, may be entitled to reasonable attorney's fees. Relief under this section does not exclude other remedies provided by law.*

Breach of contract, or default, is commonly defined as the failure of one party (Wyndham Vacation Resorts) to live up to its contractual obligations without a legally valid reason for doing so. In this case, it is believed that consumer protection laws were violated through deceptive and misleading practices at the time of sale.  Joel and Angela Kuchcik allege that their ownership agreement in Contract #00064-0926416 was misrepresented by representatives of Wyndham Vacation Resorts, and these actions would render the contract voidable.  Fraud is defined as occurring when: "…One party knowingly makes a material misrepresentation which is reasonably relied upon by another party to their detriment."

In light of the material misrepresentations and the breach of the Implied Covenant of Good Faith and Fair Dealing made by representatives at Wyndham Vacation Resorts, our clients

are exercising their rights under laws, enacted in every state prohibiting unfair and deceptive trade practices in consumer transactions, to terminate this contract.

Joel and Angela Kuchcik are also opting to dispute any and all charges made by Wyndham Vacation Resorts pursuant to the FAIR CREDIT BILLING ACT (FCBA), 15 U.S.C. §§ 1601, et seq. Statute 161 "Billing Errors" of the FCBA allows for dispute of unauthorized charges and/or charges for goods and services unaccepted or undelivered as agreed.

Per the terms of Contract #00064-0926416, this notification has been sent in writing and delivered via certified mail, return receipt requested, to the addresses indicated in the contract:

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Joel and Angela Kuchcik have also expressed a strong desire to report the behavior of Wyndham Vacation Resorts representatives to the following agencies: the Federal Trade Commission, the Florida Department of Real Estate, the Florida Attorney General, Bill McCollum.

If you would like to resolve this matter with Joel and Angela Kuchcik, you may contact our Resolutions Department at 866-644-7776, ext. 588. You may also contact us at the address listed above. Please refer all future correspondence directly to this office.

Thank you in advance for your attention to this matter.

Regards,


The Owners' Advocate, (TOA, LLC)

Copy:              Joel and Angela Kuchcik
Attachments:   LPOA; Client Testimony; Client Contract

# The Owners' Advocate
## (TOA, LLC)
7984 Coley Davis Road
Nashville, TN  37221
## 1-866-644-7776
## Fax 1-866-998-9796

SENT VIA EMAIL TO:  brenda.george@wyndhamvo.com

October 5, 2009

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Members: Joel and Angela Kuchcik  Contract # 00005-0803253

This letter is to notify you that Joel and Angela Kuchcik have retained our services to assist them in the termination of their agreement to purchase with Wyndham Vacation Resorts. We are authorized to notify you, through Power of Attorney, that Joel and Angela Kuchcik no longer intend to make further payments to Wyndham Vacation Resorts as they allege the terms of Contract #00005-0803253 were fraudulently represented at the time of sale.

Also, be advised that Joel and Angela Kuchcik no longer authorize Wyndham Vacation Resorts to make automatic withdrawals from their personal debit/credit card or bank account (if previously authorized to do so), and the cessation of any and all such withdrawals shall be effective immediately.

Our organization, The Owners' Advocate, (TOA, LLC), is a consumer rights protection group providing assistance and resources to consumers battling fraud and misrepresentation within the timeshare industry.  We assist timeshare owners by monitoring, investigating, and exposing timeshare companies that fail to comply with the laws governing the rights of consumers.  We do not provide legal advice and we do not represent ourselves as legal experts.

Joel and Angela Kuchcik allege their right to cancel their contract with Wyndham Vacation Resorts due to various misrepresentations and fraud employed by the company's representative(s) during the sales presentation.  The infractions alleged by our clients would therefore, under Tennessee State Law, render the contract voidable.  Some of the allegations of misrepresentation and fraud include the following:

- Falsely claiming that the timeshare presentation would be limited to ninety minutes;
- Falsely misrepresenting a timeshare presentation as an opinion or an update meeting;
- Falsely claiming that the timeshare was an investment which would appreciate like real estate;
- Falsely claiming that the timeshare interest could be written off on a tax report;
- Falsely claiming that the construction of a new water park would increase the value of the timeshare;
- Falsely exaggerating the ease with which vacations could be booked;

1

- Falsely claiming that the timeshare points purchase would be more than enough to be able to book reservations anywhere, anytime;
- Falsely claiming that the maintenance fees would never increase;
- Falsely claiming that the maintenance fees would never increase by much
- Falsely claiming that maintenance fees could be offset by owner referrals;
- Falsely claiming that maintenance fees could be offset by a rental program;
- Falsely promising to act as a personal account manager;
- Falsely claiming that maintenance fees could be offset through the use of a MasterCard;
- Falsely claiming that the timeshare interest loan could be refinanced for a lower rate at a local bank;
- Falsely promising that an RCI coupon was good for any time;
- Falsely promising that all future timeshare units booked with Wyndham would be equivalent in quality to those shown during the tour;
- Falsely claiming to be on vacation as to avoid providing customer service after falsely promising to be a personal account representative for the customer;
- Falsely claiming that more points had to be purchased in order to be able to make reservations;
- Using unauthorized materials to detail the advantages of a timeshare purchase;
- Falsely claiming that the customer could make a living through the rental of their timeshares;
- Falsely claiming that the timeshare could be sold for a profit;
- Falsely claiming that the timeshare could be rented for a profit; and
- Falsely claiming that if the customer didn't purchase immediately, the offer would expire.

Facts:

In August 2007, Joel and Angela Kuchcik took their kids to the Wisconsin Dells and stayed at the Wilderness Resort for a long weekend to close out the summer. When they checked in, they were approached by a sales representative who offered them free tickets to all of the local attractions, $40 in tokens for the hotel arcade, and a free dinner for that night in exchange for sitting in on a Wyndham presentation that would last only ninety minutes. He promised that it was not a sales meeting, and that they simply wanted opinions on the resort. The meeting was scheduled and the next morning Joel and Angela met with Brian Washington, a sales representative from Wyndham.

Brian told Joel and Angela that the timeshare was an investment, which would appreciate like real estate, and that they could write off the interest from the purchase on their taxes. Brian stated that there were plans for a new water park right on the property and once it was built that the property would increase the value of the timeshare exponentially. Brian claimed that Joel and Angela could comfortably vacation on 210,000 points, every other year. Joel and Angela were told that it was enough to go wherever they would like to go at whatever time they wanted to travel. Brian repeatedly stated that the timeshare was an investment that their children could take over when they were gone. The pressure to purchase was centered around the two children, who were sitting next to Joel and Angela, listening to the presentation. Brian claimed that the maintenance fees would never go up and that it would be locked at its current rate for the entirety of Joel and Angela's lives. When Joel and Angela, after the purchase, found out that this was false, they called Wyndham, and a Wyndham representative told them although the sales representative had been incorrect, there was nothing they could do for the Kuchciks.

During the presentation, Joel and Angela told Brian and Brian's manager that they did not have the money to finance the timeshare loan. Brian stated that they could use a home equity loan to finance it. The gentleman that took care of Joel and Angela's closing stated the same thing. They encouraged this action, and told Joel and Angela that they

2

should refinance with their personal bank to get a lower interest rate. The presentation was still going, after four hours. Brian told Joel and Angela that the offer was only good for that moment, and that they didn't have time to think about it and get back to him later that day. Joel and Angela said they still weren't sure, and that they didn't have any money on them. Brian took them over to a woman who talked to them about the RCI Elite Credit Card. They quickly opened up an account for Joel and Angela and charged the down payment onto the credit card for $1,595. Brian placed Joel and Angela with a finance representative to finalize the sale.

After the finalization, Joel and Angela were told that they needed to wait until the new year hit, which was four months away, thus postponing them from making any reservations for future trips. Once the member ID came in the mail, Joel and Angela started calling Wyndham to try and make reservations for their next vacation. They were repeatedly turned down because of a lack of availability for April 2008.

During the presentation, Brian had given Joel and Angela a coupon to use with RCI, which he said would garner them a free vacation. He claimed the coupon could be used at any time, but when Joel and Angela tried to redeem it, RCI told them that it was only good for certain times of the year and that timeshare companies often claimed otherwise to their customers. Joel and Angela were never able to use that vacation.

In April of 2008, Joel and Angela settled for the only resort with any availability, which was Fairfield Glades in Tennessee. Their condo was not up to the standard they expected, smelling musty and looking worn down. They were shocked, because Brian had taken them through three model condos and had claimed that they would be able to relax in all of their future vacations, and kept commenting on how beautiful the condos would be. He led Joel and Angela to believe that each one of their future trips would be spent in condos like the model condos he was showing to them.

When Joel and Angela checked in they were told that they had to sign up for an owner's meeting so that they could be updated on all the new, exciting things going on with Wyndham and some changes in Wyndham policies. They asked if it was a sales meeting, and were told that it was not. They were also told that they needed to attend the meeting in order to get their local coupons and "bag" of essentials. However, when Joel and Angela sat down with Scott Padgett, they found out that it was indeed a timeshare presentation. Joel and Angela complained about the misrepresentations that they had been subject to in Wisconsin and Scott claimed that they had been "taken" by Brian, who had sold them a deed that was not useable. Scott claimed that in order to make a reservation anywhere decent they would need to sell their deed back to Wyndham and buy a deed that would give them points every year and not every other year. He called this "DSP" (deed specific priority). Scott also told Joel and Angela that this was the reason that they had gotten such a rundown condo. He said that they needed more points in order to be able to stay in the nicer, remodeled condos. He even took the two of them through his models and assured that if they upgraded their deed to Bonnet Creek they would get nothing less than what he was showing them.

Scott claimed that Wyndham was willing to do a one-time offer with Joel and Angela, offering them the ability to buy a new contract with Bonnet Creek, Florida. Joel and Angela were told that Bonnet Creek was better than the Dells for the Bonnet Creek property. Mr. Padgett and his boss, Mike, claimed that it would be easy to sell the Bonnet Creek timeshare if they ever wanted to sell it in the future. Joel and Angela were told that since it was on Disney property, it would sell anytime. Scott claimed that the offer was only good for as long as they were in his office, and that since the building they would be placed in was new construction, they would obtain the best deal by purchasing at that time.

Scott claimed that if they made the deal, that he would be assigned to them as a personal account manager, because they would have enough points to warrant that luxury. However, after the sale, Joel and Angela found that Scott was never available. Once, Scott's "wife" contacted Joel and Angela to tell them that he was out of town at a Wyndham conference for the next three weeks. Joel and Angela didn't believe this call, and so called the main desk at the resort, and asked to speak to someone other than Scott, since he

wasn't there for three weeks. The receptionist was confused, since Scott was in fact in the office, and had been all week. Joel and Angela escalated this issue to a manager, who forced Scott to call and apologize. Scott also claimed that he would send them an RCI free trip coupon, which never came. When Joel and Angela asked for a new personal representative, they were told by Wyndham that that title didn't exist and then stopped returning Joel and Angela's calls.

Joel and Angela were told that maintenance fees would go up but only a little bit and that they wouldn't increase very often. Scott told Joel and Angela that they could eliminate their maintenance fees with owner referrals and by signing up for the Trip Rewards MasterCard. Scott told Joel and Angela that for every dollar they spent on it, those dollars would be converted into maintenance dollars, which would eliminate the monthly maintenance fee easily. Joel and Angela signed up for the card, but soon found out that maintenance fees could not be eliminated by converting rewards points like Scott had claimed. Scott also showed Joel and Angela how they could offset or pay their maintenance fees by taking their points and renting them out. Wyndham would rent the points for them for 35% of the amount the unit rented for. Scott failed to mention the fact that resorts that make the highest rent or are the easiest to rent are given to the owners of these locations first. He also neglected to tell Joel and Angela that only 5% of each resort is allowed to be rented through Club Wyndham Access. He even instructed Joel and Angela to use eBay so that Wyndham would not catch on to what they were doing and stop them from selling their points.

Scott claimed that Joel and Angela could use their points to purchase airfare, cruises, car rentals, and amenities like Disney Park passes. He claimed that the more they bought the better off they would be. After agreeing to purchase the new 259,000 points every year at Bonnet Creek, Florida, Scott shook Joel and Angela's hands and promised them that everything that he had told them was true and that they were finally in good hands. The presentation had lasted eight hours, forcing Joel and Angela to lose a full day of their vacation.

Joel and Angela repeatedly tried to book a vacation at a resort, and finally got into Star Island in November of 2008. When they walked into their condo, it was again old, outdated, and looked nothing like the models that Scott had showed them. Angry, Joel and Angela told the receptionist they didn't want to sit through another sales pitch and demanded to speak with someone regarding questions they had about the problems they continued to have with their Wyndham timeshare. They were placed in the sales room and introduced to the general manager. Joel and Angela asked many questions, and none were answered. The manager handed them off to what he called a Customer Service Survey member. This person also had no answers, but did begin a timeshare sales presentation. Joel and Angela were angered, and walked out.

Joel and Angela visited Bonnet Creek in Florida in June 2009. Again, they met with a salesman, but said they didn't want to sit through the ninety minute presentation. They were determined to get their questions answered by a live person, and were assigned to a representative named James Oh. They explained their problems, and James told them that the reason they were still having trouble with their reservations was due to the fact that they needed to own 300,000 points and be a VIP member in order to get priority reservations. He used a diagram that was in the shape of a pyramid that showed Joel and Angela that they were in the bottom of the pyramid and that all of the people who owned more points were getting reservations in the nice resorts during peak periods.

James told Joel and Angela that their deed was to a good resort but that it didn't mean much because they needed to buy more points in order to ever get a reservation. Joel and Angela told James that they were not in a position to purchase more points and that the last two salesmen had already lied to them on the same issue. They were leaving when James claimed that he had suddenly gotten some foreclosures because of the economy that he would be able to sell. James claimed that Wyndham was pretty much giving them away. He claimed that even friends and family could use the timeshare, and that Joel and Angela could charge them for staying there. He asked them to get closer to

4

the table and told them how they could rent the timeshare for a profit. James showed them a picture of a couple on his shelf, and said that they owned a couple million points and rented them out, turning the rental of their timeshares into a business. James said that the couple has so many points that they actually have people who work for them now. James insisted that Joel and Angela could earn a living using a rental program and that by renting their points, they could afford the new deed. They were also told they could use their points to purchase airfare, cruises, car rentals, and amenities like Disney park passes. James told them their current timeshare was useless and that if they didn't take advantage of the opportunity that day, the offer would expire.

James told Joel and Angela that if they put the down payment on a credit card that they could pay that off quickly by renting out the points. Joel and Angela bought what James claimed was a foreclosure deed, which gave them 224,000 points every even year. Again, the deed didn't kick in until January 2010. Joel and Angela are making payments on it for the next six months and are not able to use it at all. James assured Joel and Angela that even though it was every other year like the one in Wisconsin, that this one was better because it put them at the VIP mark, which is where they needed to be to get anywhere with the reservation folks. They spent over five hours of their vacation time going through James's sales pitch, while their children were forced to spend time in the children's area, which was inaccessible from the sales office. James claimed that now that they were VIP, he would be their personal advocate and that they could call him anytime to book a trip or ask questions about the plan. Since this last purchase, Joel and Angela have tried to contact the sales team at Bonnet Creek but have never received a call back.


It is the opinion of Joel and Angela Kuchcik that consumer protection laws have been violated at the time of sale. These laws, which are readily available and accessible to anyone through the Internet and other resources, are public information. Some of these laws are listed below:

> Part 1
> —Time-Share Act of 1981

> 66-32-121. Powers and duties of commission. —

>> (f) The commission shall have the power to revoke, or suspend the real estate license of a sales agent, or the registration of a time-share project, or to otherwise appropriately discipline the sales agent, or fine the developer pursuant to the provisions of § 56-1-308, if, after notice and hearing, any of the following conditions exist:

>> (1) Any representation in any document or information filed with the commission is false or misleading; or

>> (2) Any developer or agent of a developer has:

>> (A) Engaged in or is engaging in any unlawful act or practice;

>> (B) Disseminated or caused to be disseminated orally, or in writing, any false or misleading promotional materials in connection with a time-share program;

>> (C) Concealed, diverted, or disposed of any funds or assets of any person in a manner impairing rights of purchasers of time-share intervals in the time-share program;

(D)  Failed to perform any stipulation or agreement made to induce the commission to issue an order relating to that time-share program;

(E)  Otherwise violated any provision of this part or the commission's rules, regulations, or order

(F)  Makes any willful or negligent misrepresentation, or any willful or negligent omission of material fact about any time-share or time-share project, or exchange program;

(G)  Makes any false promises of a character likely to influence, persuade or induce;

(H)  Engages in any other conduct which constitutes improper, fraudulent or dishonest dealing; or

(I)  Fails to promptly account for any funds held in trust, or who fails to display all records, books and accounts of such funds to the commission upon demand as provided for in this part, and the rules and regulations.

Part 1
—Time-Share Act of 1981

66-32-132. Advertising — Specific prohibitions. —

No advertising for the offer or sale of time-share intervals shall:

(1)  Contain any representation as to the availability of a resale program or rental program offered by or on behalf of the developer or its affiliate unless the resale program and/or rental program has been made a part of the offering and submitted to the commission;

(2)  Contain an offer or inducement to purchase which purports to be limited as to quantity or restricted as to time unless the numerical quantity and/or time applicable to the offer or inducement is clearly and conspicuously disclosed;

(3)  Contain any statement concerning the investment merit or profit potential of the time-share interval unless the commission has determined from evidence submitted on behalf of the developer that the representation is neither false nor misleading;

(4)  Make a prediction of or imply specific or immediate increases in the price or value of the time-share intervals; nor shall a price increase of a time-share interval be announced more than sixty (60) days prior to the date that the increase will be placed into effect;

(5)  Contain statements concerning the availability of time-share intervals at a particular minimum price if the number of time-share intervals available at that price comprises less than ten percent (10%) of the unsold inventory of the developer, unless the number of time-share intervals then for sale at the minimum price is set forth in the advertisement;

(6)  Contain any statement that the time-share interval being offered for sale can be further divided unless a full disclosure is included as to the legal requirements for further division of the time-share interval;

(7)  Contain any asterisk or other reference symbol as a means of contradicting or

changing the ordinary meaning of any previously made statement in the advertisement;

(8) Misrepresent the size, nature, extent, qualities, or characteristics of the accommodations or facilities which comprise the time-share project;

(9) Misrepresent the nature or extent of any services incident to the time-share project;

(10) Misrepresent or imply that a facility or service is available for the exclusive use of purchasers or owners if a public right of access or of use of the facility or service exists;

(11) Make any misleading or deceptive representation with respect to the contents of the time-share program, the purchase contract, the purchaser's rights, privileges, benefits or obligations under the purchase contract or this part;

(12) Misrepresent the conditions under which a purchaser or owner may participate in an exchange program; or

(13) Describe any proposed or uncompleted private facilities over which the developer has no control unless the estimated date of completion is set forth and evidence has been presented to the commission that the completion and operation of the facilities are reasonably assured within the time represented in the advertisement.

Breach of contract, or default, is commonly defined as the failure of one party (Wyndham Vacation Resorts) to live up to its contractual obligations without a legally valid reason for doing so. In this case, it is believed that consumer protection laws were violated through deceptive and misleading practices at the time of sale. Joel and Angela Kuchcik allege that their ownership agreement in Contract #00005-0803253 was misrepresented by representatives of Wyndham Vacation Resorts, and these actions would render the contract voidable. Fraud is defined as occurring when: "…One party knowingly makes a material misrepresentation which is reasonably relied upon by another party to their detriment."

In light of the material misrepresentations and the breach of the Implied Covenant of Good Faith and Fair Dealing made by representatives at Wyndham Vacation Resorts, our clients are exercising their rights under laws, enacted in every state prohibiting unfair and deceptive trade practices in consumer transactions, to terminate this contract.

Joel and Angela Kuchcik are also opting to dispute any and all charges made by Wyndham Vacation Resorts pursuant to the FAIR CREDIT BILLING ACT (FCBA), 15 U.S.C. §§ 1601, et seq. Statute 161 "Billing Errors" of the FCBA allows for dispute of unauthorized charges and/or charges for goods and services unaccepted or undelivered as agreed.

Per the terms of Contract #00005-0803253, this notification has been sent in writing and delivered via certified mail, return receipt requested, to the addresses indicated in the contract:

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Joel and Angela Kuchcik have also expressed a strong desire to report the behavior of Wyndham Vacation Resorts representatives to the following agencies: the Federal Trade Commission, the Tennessee Department of Real Estate, the Tennessee Attorney General, Robert E. Cooper, Jr.

If you would like to resolve this matter with Joel and Angela Kuchcik, you may contact our Resolutions Department at 866-644-7776, ext. 588. You may also contact us at the address listed above. Please refer all future correspondence directly to this office.

Thank you in advance for your attention to this matter.

Regards,


The Owners' Advocate, (TOA, LLC)

Copy:                        Joel and Angela Kuchcik
Attachments:            LPOA; Client Testimony; Client Contract

# The Owners' Advocate
## (TOA, LLC)
7984 Coley Davis Road
Nashville, TN   37221
1-866-644-7776
Fax 1-866-998-9796

SE_____ EMAIL TO: brenda.george@wyndhamvo.com

October 5, 2009

W_____ n Vacation Resorts
84_____ uth Park Circle, Suite 500
Orl_____, FL   32819

Ma_____: Stephen and Gloria Cooper, Contract # 77180072168

Thi_____er is to notify you that Stephen and Gloria Cooper have retained our services to as_____em in the termination of their agreement to purchase with Wyndham Vacation Re_____. We are authorized to notify you, that Stephen and Glo_____oper no longer intend to make further payments to Wyndham Vacation Resorts as they_____ge the terms of Contract #77180072168 were fraudulently represented at the time of s_____.

Also,_____advised that Stephen and Gloria Cooper no longer authorize Wyndham Vacation Re_____to make automatic withdrawals from their personal debit/credit card or bank acc_____(if previously authorized to do so), and the cessation of any and all such wi_____als shall be effective immediately.

Our_____nization, The Owners' Advocate, (TOA, LLC), is a consumer rights protection group pro_____assistance and resources to consumers battling fraud and misrepresentation wi_____e timeshare industry. We assist timeshare owners by monitoring, investigating, an_____sing timeshare companies that fail to comply with the laws governing the rights of con_____rs. We do not provide legal advice and we do not represent ourselves as legal exp_____.

St_____and Gloria Cooper allege their right to cancel their contract with Wyndham Vac_____Resorts due to various misrepresentations and fraud employed by the company's repr_____ntative(s) during the sales presentation. The infractions alleged by our clients wr_____erefore, under Virginia Law, render the contract voidable. Some of the allegations of_____resentation and fraud include the following:

- _____alsely promising the presentation would last only 90 minutes;
- _____tentionally misleading our clients to believe maintenance fees would only increase _____ightly, if at all;
- _____tentionally misleading our clients to believe that if they did not purchase that day, _____he offer would expire;
- _____tentionally misleading our clients to believe that the gold membership card allowed _____em to purchase amenities at a discounted price or access them for free;
- _____tentionally misleading our clients to believe that their children would be given their _____wn discount cards;
- _____ailing to disclose to our clients that if a child of theirs was over the age of 22, that _____hild would have to be added to the deed;

1

- Intentionally misleading our clients to believe they could use the interest on the timeshare as a tax deduction;
- Intentionally misleading our clients to believe they could refinance through their own bank for a lower interest rate;
- Intentionally misleading our clients to believe they could rent or sell the timeshare for a profit; and,
- Intentionally misleading our clients to believe the timeshare was an investment and would appreciate in value like real estate.

Facts:

In August of 2008, Stephen and Gloria Cooper were contacted by Wyndham and solicited to come and visit their resort in Williamsburg, Virginia. Mrs. Cooper was not interested in the Williamsburg area, and was told she could also visit their sister resort in Massanutten, Virginia. Our clients made an appointment to visit Massanutten.

Mr. and Mrs. Cooper arrived on time for the 11am appointment. They were required to wait ½ an hour for their sales representative, Shawn Pope, to take them on the tour. Our clients were promised the tour would take only 90 minutes; however, the tour lasted until 4.30pm.

Mr. and Mrs. Cooper were told that they could allow friends and family to use the timeshares for an extra fee. They were told they could place the timeshare in a trust and will it to their children. Mr. and Mrs. Cooper asked about maintenance fees, and were told that the fees would increase only slightly, but that maintenance fees had not increased in 25 years. Mr. and Mrs. Cooper found this to be false: when they received the first maintenance fee bill for 2009, the fees had already increased dramatically.

Initially, our clients believed that they had purchased four (4) weeks at Massanutten Resort; they found later that they had actually purchased two weeks at Massanutten, and two floating weeks with RCI. Reservations made with RCI had to be made 2-45 days prior to arrival, and carried an additional fee. Mr. and Mrs. Cooper were told they were purchasing into a new development, which gave them a better deal. However, if our clients did not purchase that day, the offer would expire.

Mr. and Mrs. Cooper were told that along with their timeshare, they would be given a gold membership, which allowed them access to the amenities at the resort. Mr. and Mrs. Cooper understood that with this card, amenities would be free or heavily discounted. Mr. and Mrs. Cooper found this to be untrue. When filling out the paperwork for the membership, our clients were instructed to list their children and their dates of birth, so that cards could be issued to their children as well. Temporary cards would be issued first, then permanent cards would be sent later. This information was misleading to our clients: when their sons did not receive the cards in the mail, they went to the resort to get the cards but one son was issued a card, while the second was not. Apparently, to get a card issued, children had to be under the age of 22; if a child was over the age of 22, he or she had to be added to the deed as an owner. This information was not disclosed to our clients during the sale and processing of paperwork. Mr. and Mrs. Cooper had to hire an attorney to have their son added to the deed.

At the time of sale, Mr. and Mrs. Cooper met with closing agent Lisa Wise. Ms. Wise advised our clients that they could use the interest on the timeshare as a tax deduction, and they could also refinance the timeshare with their own bank for a lower interest rate.

Furthermore, Mr. and Mrs. Cooper were told they could rent or sell the timeshare for profit. They were told the timeshare was a financial investment, and would appreciate just like real

2

estate.

It is the opinion of Stephen and Gloria Cooper that consumer protection laws have been violated at the time of sale. These laws, which are readily available and accessible to anyone through the Internet and other resources, are public information. Some of these laws are listed below:

§ 55-396. General powers and duties of Board.

D. 1. If the Board determines after legal notice and opportunity for hearing that a developer or agent of developer has:

    *a. Made any representation in any document or information filed with the Board which is false or misleading;*

    *b. Engaged or is engaging in any unlawful act or practice;*

    *c. Disseminated or caused to be disseminated orally, or in writing, any false or misleading promotional materials in connection with a time-share program;*

    *d. Concealed, diverted, or disposed of any funds or assets of any person in a manner impairing rights of purchasers of time-shares in the time-share program;*

    *e. Failed to perform any stipulation or agreement made to induce the Board to issue an order relating to that time-share program;*

    *f. Otherwise violated any provision of this chapter or any of the Board's rules and regulations or orders; or*

    *g. Disposed of any time-share in a project without first complying with the requirements of this chapter, it may issue an order requiring the developer to cease and desist from the unlawful practice and to take such affirmative action as in the judgment of the Board will carry out the purposes of this chapter.*

Breach of contract, or default, is commonly defined as the failure of one party (Wyndham Vacation Resorts) to live up to its contractual obligations without a legally valid reason for doing so. In this case, it is believed that consumer protection laws were violated through deceptive and misleading practices at the time of sale. Stephen and Gloria Cooper allege that their ownership agreement in Contract #77180072168 was misrepresented by representatives of Wyndham Vacation Resorts, and these actions would render the contract voidable. Fraud is defined as occurring when: "*...One party knowingly makes a material misrepresentation which is reasonably relied upon by another party to their detriment.*"

In light of the material misrepresentations and the breach of the Implied Covenant of Good Faith and Fair Dealing made by representatives at Wyndham Vacation Resorts, our clients are exercising their rights under laws, enacted in every state prohibiting unfair and deceptive trade practices in consumer transactions, to terminate this contract.

Stephen and Gloria Cooper are also opting to dispute any and all charges made by Wyndham Vacation Resorts pursuant to the FAIR CREDIT BILLING ACT (FCBA), 15 U.S.C. §§ 1601, et seq. Statute 161 "Billing Errors" of the FCBA allows for dispute of unauthorized charges and/or charges for goods and services unaccepted or undelivered as agreed.

3

Per the terms of Contract #77180072168, this notification has been sent in writing and delivered via certified mail, return receipt requested, to the addresses indicated in the contract:

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL  32819

Stephen and Gloria Cooper have also expressed a strong desire to report the behavior of Wyndham Vacation Resorts representatives to the following agencies:  Federal Trade Commission, Virginia Real Estate Commission, Attorney General Bob McDonnell.

If you would like to resolve this matter with Stephen and Gloria Cooper, you may contact our Resolutions Department at 866-644-7776, ext. 588.  You may also contact us at the address listed above.  Please refer all future correspondence directly to this office.

Thank you in advance for your attention to this matter.

Regards,


The Owners' Advocate, (TOA, LLC)

| | |
|---|---|
| Copy: | Stephen and Gloria Cooper |
| Attachments: | LPOA; Client Testimony; Client Contract |

GENERAL AFFIDAVIT

State of Virginia
County of Louisa

Before the undersigned, an officer duly commissioned by the laws of **STATE** ^VA, on this Oct day of
_____, 2009, personally appeared **YOUR NAME HERE**, who Stephen / Gloria Cooper
makes this his/her statement upon oath and affirmation of belief that the following facts set forth are
true and correct to the best of his/her knowledge:

In August of 2008, my husband and I were contacted by the resort to come visit Williamsburg,
Virginia. I really was not interested in the Williamsburg area. They told us that we could visit their
sister resort in Massanutten in Harrisburg, Virginia. Our appointment was set for 11am. We arrived
on time and waited for a ½ hour for our sales representative, Shawn Pope, to take us on the tour. We
were taken to a large room where our tour began, with the sales team telling us that the tour would
take only 90 minutes of our time. At 4.30pm we finally came back to the room where we had started.

When the timeshare was presented to us we were told lots of different things. We were told that
family and friends could use the facilities in our place but with an increased fee. We were also told
that this timeshare program would be placed in a trust and passed down [to heirs]. When we asked
about the timeshare maintenance fees, they said they would increase slightly, and had not increased
in 25 years. When we got our maintenance fee bill for 2009, the fees had already increased
dramatically.

We thought we were purchasing 4 weeks at Massanutten Resort; but we had only purchased 2 weeks
at Massanutten and 2 floating weeks through RCI. Reservations had to be made 2-45 days prior to
stay and you had to pay an added membership fee. We were also told by purchasing into a new
development we could get a better deal, and if we did not purchase that day the offer would expire.

When they were presenting the timeshare to us they included in the package a golden membership,
which gave you access to the amenities at the resort. It was our understanding that once you had
this card, these amenities would be free or very discounted; we did not find this to be true. When
filling out the paperwork for the gold membership card, we were told to list our kids and their dates of
birth on there, so they could get a card to use for discounts when they used the resort. They would
be issued a temporary card and they would be sent permanent cards. This was very misleading,
because when our sons did not get their cards in the mail, they went to the resort to get their
permanent cards, and one was issued a card and one was not. You had be be under the age of 22,
and if you were over 22, your name had to be added to the deed as an owner, which meant we had to
hire an attorney. All the ages of our children were stated on that sheet.

Our closing agent was Lisa Wise. We were told that the interest could be a tax write-off and we could
go to our bank and get a lower rate.

We were also told that we could sell the timeshare for profit and it also could be rented for profit, and
that this was also an investment and would appreciate like real estate. None of our income was ever
verified. We felt that the typical high-pressure sales techniques were used.

_____  Gloria Cooper
Signature of Affiant

Sworn and subscribed before me this 1st day of Oct, 2009.

Notary Public

My Commission Expires:

Nov 30 2013



OFFICIAL SEAL
NOTARY PUBLIC-COMMONWEALTH OF VIRGINIA
GINGER L. HICKS
COUNTY OF LOUISA
ID# 7270281
My Commission Expires
November 30, 2013

# The Owners' Advocate
## (TOA, LLC)
7984 Coley Davis Road
Nashville, TN  37221
## 1-866-644-7776
## Fax 1-866-998-9796

SENT VIA EMAIL TO:  brenda.george@wyndhamvo.com

October 7, 2009

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Members: Russ and Ellen LaRocco  Contract #00028-0950478

This letter is to notify you that Russ and Ellen LaRocco have retained our services to assist them in the termination of their agreement to purchase with Wyndham Vacation Resorts. We are authorized to notify you, through Power of Attorney, that Russ and Ellen LaRocco no longer intend to make further payments to Wyndham Vacation Resorts as they allege the terms of Contract #00028-0950478 were fraudulently represented at the time of sale.

Also, be advised that Russ and Ellen LaRocco no longer authorize Wyndham Vacation Resorts to make automatic withdrawals from their personal debit/credit card or bank account (if previously authorized to do so), and the cessation of any and all such withdrawals shall be effective immediately.

Our organization, The Owners' Advocate, (TOA, LLC), is a consumer rights protection group providing assistance and resources to consumers battling fraud and misrepresentation within the timeshare industry.  We assist timeshare owners by monitoring, investigating, and exposing timeshare companies that fail to comply with the laws governing the rights of consumers.  We do not provide legal advice and we do not represent ourselves as legal experts.

Russ and Ellen LaRocco allege their right to cancel their contract with Wyndham Vacation Resorts due to various misrepresentations and fraud employed by the company's representative(s) during the sales presentation.  The infractions alleged by our clients would therefore, under South Carolina State Law, render the contract voidable.  Some of the allegations of misrepresentation and fraud include the following:

- Falsely claiming that through the purchase of a timeshare the customers would be VIP members for life;
- Falsely claiming that the points could be used for airfare or cruises;
- Falsely claiming that the points could be used to travel anywhere at any time;
- Falsely exaggerating the ease with which reservations could be made;
- Falsely claiming that the timeshare loan could be refinanced for a lower interest rate at a local bank;
- Informing the customers that they should lie to bank representatives about the nature of their intended refinancing;
- Falsely claiming that the timeshare could be written off on a tax return; and
- Falsely claiming that a previously owned timeshare was useless.

1

Facts:

In August 2008, Russ and Ellen LaRocco visited Atlantic City and were solicited by a woman who claimed that she would give Russ and Ellen $50 if they took thirty minutes to speak to someone from Wyndham. The meeting actually lasted four hours. The sales representative offered a 127,000 point timeshare, along with an additional 173,000 points, which would make Russ and Ellen VIP members. Russ and Ellen were told they could use these points anywhere in the world, or on cruises or airfare. Russ and Ellen agreed, but when they tried to book a vacation to Myrtle Beach, they had to wait six months for a reservation. Finally, in August 2009, the LaRocco family went to Myrtle Beach.

They made a complaint upon arrival, and Mr. Justin Kirk was waiting for them at their door to speak with them. Mr. Kirk claimed that Russ and Ellen's previous contract was unacceptable because they could only use their points on a biannual basis. Mr. Kirk claimed that if they signed a new contract with him, they would have VIP status forever. He stated that he knew the interest rates were high, but that they could refinance their timeshare loan back in New York. He also told Russ and Ellen that if a bank ever asked, they should say that they weren't refinancing a timeshare, but a property, because that was easier. He also claimed that the timeshare could be written off on Russ and Ellen's taxes. However, when Russ and Ellen attempted to refinance their timeshare at ten different locations, they were told that there wasn't a bank in New York that would do so.

It is the opinion of Russ and Ellen LaRocco that consumer protection laws have been violated at the time of sale. These laws, which are readily available and accessible to anyone through the Internet and other resources, are public information. Some of these laws are listed below:

SECTION 27-32-110. Prohibited practices.

It is a violation of this chapter for a seller of vacation time sharing plans to:

(1) use a promotional device including, but not limited to, sweepstakes, lodging certificates, gift awards, premiums, or discounts, without disclosing fully that the promotional device is used for the purpose of soliciting the sale of vacation time sharing plans;

(2) use a promotional device as described in item (1) to obtain the names and addresses of prospective purchasers without fully and prominently disclosing that names and addresses are acquired for the purpose of soliciting the sale of the vacation time sharing plans;

(3) misrepresent the amount of time or period of time the accommodations and facilities are available to a purchaser;

(4) misrepresent or deceptively represent the location of the offered accommodations and facilities;

(5) misrepresent the size, nature, extent, qualities, or characteristics of the offered accommodations and facilities;

(6) misrepresent the nature or extent of services incident to the accommodations and facilities;

(7) make misleading or deceptive representations with respect to the contents of the contract or the purchaser's rights, privileges, or benefits under it;

(8) fail to honor and comply with all provisions of the contract with the purchaser;

(9) misrepresent the conditions under which a purchaser may exchange his rights to an accommodation in one location for rights to an accommodation in another location;

(10) include in a contract a provision purporting to waive a right or benefit provided for

2

*purchasers pursuant to this chapter, or seek or solicit such a waiver during the effective period of these rules; and*

*(11) do any other act of fraud, misrepresentation, or failure to make a disclosure of a material fact.*

Breach of contract, or default, is commonly defined as the failure of one party (Wyndham Vacation Resorts) to live up to its contractual obligations without a legally valid reason for doing so. In this case, it is believed that consumer protection laws were violated through deceptive and misleading practices at the time of sale. Russ and Ellen LaRocco allege that their ownership agreement in Contract #00028-0950478 was misrepresented by representatives of Wyndham Vacation Resorts, and these actions would render the contract voidable. Fraud is defined as occurring when: "...*One party knowingly makes a material misrepresentation which is reasonably relied upon by another party to their detriment.*"

In light of the material misrepresentations and the breach of the Implied Covenant of Good Faith and Fair Dealing made by representatives at Wyndham Vacation Resorts, our clients are exercising their rights under laws, enacted in every state prohibiting unfair and deceptive trade practices in consumer transactions, to terminate this contract.

Russ and Ellen LaRocco are also opting to dispute any and all charges made by Wyndham Vacation Resorts pursuant to the FAIR CREDIT BILLING ACT (FCBA), 15 U.S.C. §§ 1601, et seq. Statute 161 "Billing Errors" of the FCBA allows for dispute of unauthorized charges and/or charges for goods and services unaccepted or undelivered as agreed.

Per the terms of Contract #00028-0950478, this notification has been sent in writing and delivered via certified mail, return receipt requested, to the addresses indicated in the contract:

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Russ and Ellen LaRocco have also expressed a strong desire to report the behavior of Wyndham Vacation Resorts representatives to the following agencies: the Federal Trade Commission, the South Carolina Department of Real Estate, the South Carolina Attorney General, Henry McMaster.

If you would like to resolve this matter with Russ and Ellen LaRocco, you may contact our Resolutions Department at 866-644-7776, ext. 588. You may also contact us at the address listed above. Please refer all future correspondence directly to this office.

Thank you in advance for your attention to this matter.

Regards,


The Owners' Advocate, (TOA, LLC)

Copy:                    Russ and Ellen LaRocco
Attachments:        LPOA; Client Testimony; Client Contract

# The Owners' Advocate
## (TOA, LLC)
7984 Coley Davis Road
Nashville, TN 37221
## 1-866-644-7776
## Fax 1-866-998-9796

RECEIVED
OCT 2 0 2009
Consumer Affairs

SENT VIA EMAIL TO: brenda.george@wyndhamvo.com

October 9, 2009

COPY

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Members: Randall and Mary Oakley  Contract #00041-0736508

This letter is to notify you that Randall and Mary Oakley have retained our services to assist them in the termination of their agreement to purchase with Wyndham Vacation Resorts. We are authorized to notify you, through Power of Attorney, that Randall and Mary Oakley no longer intend to make further payments to Wyndham Vacation Resorts as they allege the terms of Contract # 00041-0736508 were fraudulently represented at the time of sale.

Also, be advised that Randall and Mary Oakley no longer authorize Wyndham Vacation Resorts to make automatic withdrawals from their personal debit/credit card or bank account (if previously authorized to do so), and the cessation of any and all such withdrawals shall be effective immediately.

Our organization, The Owners' Advocate, (TOA, LLC), is a consumer rights protection group providing assistance and resources to consumers battling fraud and misrepresentation within the timeshare industry. We assist timeshare owners by monitoring, investigating, and exposing timeshare companies that fail to comply with the laws governing the rights of consumers. We do not provide legal advice and we do not represent ourselves as legal experts.

Randall and Mary Oakley allege their right to cancel their contract with Wyndham Vacation Resorts due to various misrepresentations and fraud employed by the company's representative(s) during the sales presentation. The infractions alleged by our clients would therefore, under Nevada State Law, render the contract voidable. Some of the allegations of misrepresentation and fraud include the following:

- Falsely claiming that the timeshare was an investment;
- Falsely claiming that the timeshare could be rented for a profit;
- Falsely claiming that the timeshare could be sold for a profit;
- Failing to mention important fees associated with extending the use of points;
- Falsely exaggerating the value of the accommodations to be provided on future vacations;
- Falsely claiming that the customer would have "dual ownership";
- Falsely claiming that the timeshare would appreciate in value like real estate;
- Falsely claiming that the timeshare could be put in the name of the customer's business;
- Falsely claiming that the customer needed to purchase more points to buy

1

into a new ownership program and to avoid real estate taxes;
- Misrepresenting a sales presentation as an update meeting;
- Falsely exaggerating the value of points when traded in for airfare, car rentals, and motel stays; and
- Putting the customer under undue pressure to purchase a timeshare.

Facts:

On December 13, 2005, Randall and Mary Oakley went to Myrtle Beach on a promotional vacation purchased with a Wyndham Discovery package. Per the terms of that purchase, they attended a timeshare sales meeting. During the meeting, they were told that the timeshare was an investment, that they could make money renting out their week, that they could sell the timeshare through a real estate agent which Wyndham would provide to them, and that they could bank points with RCI if they were about to expire to extend them. However, they weren't told they would have to pay a fee to do so.

On March 23, 2007, Randall and Mary Oakley went to Las Vegas on a promotional vacation with another couple. The sales representative at the meeting, Jay Thomas, focused on the fact that Fairfield had "merged" with Wyndham. Jay claimed that if Randall and Mary purchased a timeshare, they would have dual ownership at both Bonnet Creek in Florida, and Las Vegas. Jay claimed that the timeshare would increase in value, making it an investment that could be sold at any time. He claimed that purchasing a timeshare was like buying real estate. Jay gave Randall and Mary a brochure entitled "Buying Your Home" and told them they would get rewards points for bringing their guests since they had brought a brother and his wife. However, these points weren't awarded until Randall and Mary complained months later. Jay also claimed that the timeshare could be put in the name of Randall and Mary's cleaning business. However, this was not the case. Randall and Mary later learned that the business had to be a corporation to qualify for this.

In September Randall and Mary went to Las Vegas for a cleaning convention. They used a week from what they had banked with RCI at a different resort. When that week was done they stayed an additional night at Wyndham Grand Desert. When they registered they were told that it was important for them to attend a session with a representative from Wyndham to find out all of the new things since ownership changed again. However, ownership hadn't changed. George Michaelids claimed that they hadn't been told in March that they had to pay real estate taxes above their payments on their previously purchased timeshare. George also informed them that they didn't have dual ownership at Bonnet Creek and Las Vegas. George claimed that Randall and Mary would be able to get $2,000 a week for renting out their weeks. George claimed that points could be redeemed for airline tickets, car rentals and motels, but never mentioned that there were fees associated with these actions. George also led Randall and Mary to believe that airline tickets would be between 30,000 and 40,000 points. However, they were 150,000 per ticket. George also failed to mention that the miles couldn't be used unless they were confirmed sixty days in advance.

In complaining about later vacations, Randall and Mary were promised refunds and 154,000 bonus points that were subsequently never delivered. Randall and Mary called George Michealids after a particularly negative experience at Glacier Canyon and he referred them to an owner's group that was confused when Randall and Mary called them with their complaints.

It is the opinion of Randall and Mary Oakley that consumer protection laws have been violated at the time of sale. These laws, which are readily available and accessible to

anyone through the Internet and other resources, are public information.  Some of these laws are listed below:

NRS 119A.700  *False or misleading advertising.*

*1.  It is unlawful for any person to use false or misleading information to advertise the sale of time shares.*

*2.  Unless a person has actual knowledge of the false or misleading information, the owner, publisher, licensee or operator of any newspaper, magazine, television or radio broadcasting station or their agents or employees are not liable under this chapter for any advertising of any time share carried in the newspaper, magazine or by the television or radio broadcasting station nor are any of them liable under this chapter for the contents of any advertisement.*

*(Added to NRS by 1983, 996)*

NRS 119A.710  *Unfair methods of competition; deceptive or unfair acts.  It is unlawful to engage in unfair methods of competition or deceptive or unfair acts in the offer to sell or sale of a time share including, without limitation:*

*1.  Misrepresenting or failing to disclose any material fact concerning a time share.*

*2.  Including in an agreement for the purchase of a time share provisions purporting to waive any right or benefit provided for purchasers under this chapter.*

*3.  Receiving from a prospective purchaser any money or other valuable consideration before the purchaser has received a statement of public offering.*

*4.  Misrepresenting the amount of time or period of time the unit will be available to a purchaser.*

*5.  Misrepresenting the location or locations of the unit.*

*6.  Misrepresenting the size, nature, extent, qualities or characteristics of the unit.*

*7.  Misrepresenting the nature or extent of any services incident to the unit.*

*8.  Misrepresenting the conditions under which a purchaser may exchange occupancy rights to a unit in one location for occupancy rights to a unit in another location.*

*9.  Failing to disclose initially that any promised entertainment, food or other inducements are being offered to solicit the sale of a time share.*

*10.  Conducting or participating in, without prior approval by the Division, any type of lottery or contest, or offering prizes or gifts to induce or encourage a person to visit a project, attend a meeting at which a time share will be discussed, attend a presentation or purchase a time share.*

*11.  Failing to disclose initially to a prospective purchaser any agreement between the project broker or sales agent and the developer that results in a sharing of sales proceeds in excess of a minimum sales price for a time share.*

3

12. *Any act or practice considered an unfai[r meth]od of competition or an unfair or deceptive act or practice under NRS 207.170, 207.17[ ] [.]0915 to 598.0925, inclusive, or chapter 598A or 599A of NRS.*

*(Added to NRS by 1985, 1134; A 1989, [ ] [ ]91, 98; 2001, 2516)*

Breach of contract, or default, is commonly [ ] as the failure of one party (Wyndham Vacation Resorts) to live up to its contractual [ ] [ ]tions without a legally valid reason for doing so. In this case, it is believed that co[ ] [ ] protection laws were violated through deceptive and misleading practices at the ti[ ] [ ] sale. Randall and Mary Oakley allege that their ownership agreement in Contract [ ] [ ]0041-0736508 was misrepresented by representatives of Wyndham Vacation Resorts [ ] these actions would render the contract voidable. Fraud is defined as occurring whe[ ] *One party knowingly makes a material misrepresentation which is reasonably relied [ ] [b]y another party to their detriment."*

In light of the material misrepresentations an[ ] [ ] breach of the Implied Covenant of Good Faith and Fair Dealing made by representativ[ ] [ ] Wyndham Vacation Resorts, our clients are exercising their rights under laws, en[ ] [ ] in every state prohibiting unfair and deceptive trade practices in consumer transac[ ] [ ] to terminate this contract.

Randall and Mary Oakley are also opting to di[ ] [ ] any and all charges made by Wyndham Vacation Resorts pursuant to the FAIR CRED[ ] [BI]LLING ACT (FCBA), 15 U.S.C. §§ 1601, et seq. Statute 161 "Billing Errors" of the FC[ ] [ ]ows for dispute of unauthorized charges and/or charges for goods and services unacce[ ] [o]r undelivered as agreed.

Per the terms of Contract # 00041-0736508[,] [ ] notification has been sent in writing and delivered via certified mail, return receipt [ ] [ ]ted, to the addresses indicated in the contract:

Wyndham Vacation Resorts
8427 South Park Circle, Suite 500
Orlando, FL 32819

Randall and Mary Oakley have also express[ ] [ ] strong desire to report the behavior of Wyndham Vacation Resorts representatives [ ] [ ]e following agencies: the Federal Trade Commission, the Nevada Department of R[ ] [ ] Estate, the Nevada Attorney General, Catherine Cortez Masto.

If you would like to resolve this matter with [ ] [al]l and Mary Oakley, you may contact our Resolutions Department at 866-644-7776, [ ] [ ]588. You may also contact us at the address listed above. Please refer all future c[ ] [ ]ondence directly to this office.

Thank you in advance for your attention to thi[ ] [ma]tter.

Regards,


The Owners' Advocate, (TOA, LLC)

Copy: Randall and Mary Oakley
Attachments: LPOA; Client Testimony; [ ] [ ]t Contract